CLERK'S OFFICE U.S. DIST. COURT
AT ROANOKE, VA
FILED

JUN 03 2010

JOHN F. CORCORAN, CLERK
BY:
    DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
ROANOKE DIVISION

| | |
|---|---|
| SOUTHERN ELECTRICAL SERVICES, INC., | ) ) ) |
| Plaintiff, | ) Civil Action No. 7:10CV00076 ) ) **MEMORANDUM OPINION** |
| v. | ) ) By: Hon. Glen E. Conrad |
| CORNERSTONE DETENTION PRODUCTS, INC., et al., | ) United States District Judge ) ) |
| Defendants. | ) |

This diversity action arises from a dispute between two subcontractors, Southern Electrical Services, Inc. (SES) and Cornerstone Detention Products, Inc. (Cornerstone). Cornerstone and its co-defendant, Federal Insurance Company, have filed a motion to compel arbitration. Because the court finds that there is an enforceable arbitration agreement, the defendants' motion to compel arbitration will be granted, and the plaintiff's cross-motion to refer the matter to arbitration will be dismissed as moot.

## Background

SES and Cornerstone both worked as subcontractors during the construction of the Western Virginia Regional Jail in Salem, Virginia. Howard Shockey & Sons, Inc. (Howard Shockey), the general contractor on the project, awarded the electrical subcontract to SES and the subcontract for detention and security systems work to Cornerstone.

Before Cornerstone contracted with Howard Shockey, Cornerstone contacted SES about the possibility of being a subcontractor for the conduit and raceway system that Cornerstone

would need for security electronics. In response, SES forwarded Cornerstone a bid of $620,000.00 on February 2, 2007, along with a letter outlining the work included in the bid.

On March 19, 2007, Cornerstone sent SES a letter of intent. The letter advised SES that Cornerstone intended to award SES the subcontract for the conduit and raceway system if Cornerstone entered into a contract with Howard Shockey. The letter of intent stated that "[s]ubject to [Cornerstone's] receipt and execution of a contract with our customer [Howard Shockey], Cornerstone will issue an AIA a401 subcontract for the amount below [$620,000.00]."[1]

SES was not satisfied with the letter of intent and asked that it be revised to include additional language regarding system and raceway drawings. Cornerstone complied with SES's request and sent the company a revised letter of intent. The revised letter again stated that Cornerstone would issue SES an AIA a401 subcontract if Cornerstone was selected by Howard Shockey to perform the detention and security systems work.

Howard Shockey awarded the detention and security systems subcontract to Cornerstone on April 16, 2007. The record indicates that Cornerstone began working on or about that same date.

On June 7, 2007, Mike Tompkins, SES's vice-president of operations, contacted Phillip Miller, a Cornerstone project manager, and advised Miller that SES needed several documents from Cornerstone, including an "executed contract." In response, Miller informed Tompkins that he would forward the message to Kerrick Whisenant, Cornerstone's preconstruction director.

---

[1] AIA stands for American Institute of Architects. The form contract is entitled "Standard Form of Agreement Between Contractor and Subcontractor."

2

Whisenant subsequently mailed executed contract documents to SES on August 9, 2007. The documents consisted of a one-page subcontract that summarized the work to be performed by SES, and an AIA a401 standard form of agreement (AIA a401 subcontract) which contained a mandatory arbitration clause. In an accompanying letter of transmittal, SES was directed to sign the documents and to return executed copies to Cornerstone for the company's files.

While it is undisputed that SES received the letter of transmittal and the accompanying contract documents, SES never signed the documents or returned them to Cornerstone. Nonetheless, SES continued to perform the work requested by Cornerstone, and acted consistently, in other respects, with its acceptance of the contract documents. For instance, it is undisputed that SES submitted its applications for payment consistent with Article 11 of the AIA a401 subcontract by utilizing standard AIA payment forms, and that the amounts requested by SES were based on the payment schedule contained in the AIA a401 subcontract. Additionally, SES issued insurance certificates to Cornerstone for the coverage amounts required by Article 13 of the AIA a401 subcontract, and SES submitted its initial change orders in a manner consistent with the subcontract.

In October of 2008, Whisenant notified Randall Lambeth, an SES project manager, of alleged deficiencies in SES's work and demanded remediation pursuant to § 7.2.1 of the AIA a401 subcontract. During their discussion, Lambeth stated that there was no subcontract between SES and Cornerstone. Consequently, Whisenant sent Lambeth a copy of the AIA a401 subcontract and advised him, by letter dated October 20, 2008, that although SES never executed the subcontract, "SES's work on the project constitute[d] the legal means of acceptance on its behalf." After Whisenant sent the letter to Lambeth, he had a telephone conference with Mike

Tompkins, an SES vice-president. During the conference, Tompkins did not dispute that there was a written contract between the parties.

Whisenant sent another letter to Randall Lambeth on November 5, 2008, which again invoked § 7.2.1 of the AIA a401 subcontract. Mike Tompkins responded to the letter in writing the following day. While Tompkins claimed that Cornerstone had not provided adequate documentation for SES to complete the work in question, he did not challenge the existence or validity of the written contract.

Along with his letter to Cornerstone, Tompkins sent Cornerstone a request for a change order that would have awarded SES an additional $87,253.00 to perform the work at issue. By letter dated November 10, 2008, Cornerstone rejected SES's request for a change order and insisted that the work fell within the scope of the parties' written agreement. Cornerstone advised SES that the company considered its decision on the matter to be final, and referred SES to the dispute resolution process outlined in the AIA a401 subcontract. SES did not pursue the change order request and ultimately completed the work that was addressed in the parties' correspondence. SES submitted its final application for payment on January 20, 2009.

In May of 2009, after the construction work on the project was completed, SES submitted additional change order requests to Cornerstone totaling $805,776.00. By letter dated June 5, 2009, Bruce Gibson, SES's president, advised Cornerstone that the requests were "for work requested by Cornerstone but not addressed or paid," and that SES intended to file a lien on the jail property if SES did not receive a payment confirmation by June 12, 2009. At the conclusion of the letter, Gibson stated that "Southern Electrical Services does not have a contract with

Cornerstone Detention Products, Inc. and is therefore not under [any] contract provisions for mediation and/or arbitration."

After Cornerstone rejected SES's demand for $805,776.00, SES made another demand for $414,274.00. That demand was also rejected by Cornerstone and its co-defendant, Federal Insurance Company.[2] SES subsequently filed this action against the defendants in the Circuit Court for the County of Roanoke, and it was removed to this court on February 23, 2010.

Prior to removing the case to this court, the defendants filed a motion to compel arbitration in state court. Relying on the arbitration provision contained in § 6.2 of the AIA a401 subcontract,[3] the defendants contend that the case must be referred to arbitration under the Federal Arbitration Act, 9 U.S.C. §§ 1-16. In opposing the motion, SES argues that the only binding agreement between SES and Cornerstone is reflected in Cornerstone's March 2007 letters of intent, and that the arbitration provision contained in the AIA a401 subcontract is unenforceable since SES never signed the subcontract. Nonetheless, SES has filed a cross-motion requesting that "all issues in this case" be referred to arbitration pursuant to the court's standing order on alternative dispute resolution.

The court held a hearing on the defendants' motion to compel arbitration on April 27, 2010. The matter has been fully briefed and is now ripe for review.

---

[2] According to the complaint, Cornerstone and Federal Insurance entered into an agreement by which Federal Insurance served as the named surety on a payment bond for the jail project with Cornerstone being the named principal.

[3] Section 6.2.1 of the AIA a401 subcontract provides that "[a]ny claim arising out of or related to this Subcontract, except claims as otherwise provided in Section 4.1.5 and except those waived in this Subcontract, shall be subject to arbitration."

5

## Discussion

The Federal Arbitration Act (FAA) reflects "a liberal federal policy favoring arbitration agreements." Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24 (1983). The FAA provides that a written arbitration agreement "shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA requires a court to stay "any suit or proceeding" pending arbitration of "any issue referable to arbitration under an agreement for such arbitration." 9 U.S.C. § 3.

The United States Court of Appeals for the Fourth Circuit has held that a party can compel arbitration under the FAA if it establishes four elements: "'(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the defendant to arbitrate the dispute.'" Adkins v. Labor Ready, Inc., 303 F.3d 496, 500-501 (4th Cir. 2002) (quoting Whiteside v. Teltech Corp., 940 F.2d 99, 102 (4th Cir. 1991)). In this case, SES contests the second element, arguing that there is no binding arbitration agreement.

Although the FAA does not expressly identify the evidentiary standard a party seeking to avoid arbitration must meet, "courts that have addressed the question have analogized the standard to that required of a party opposing summary judgment under Rule 56(e) of the Federal Rules of Civil Procedure." Tinder v. Pinkerton Sec., 305 F.3d 728, 735 (7th Cir. 2002) (citing decisions from other circuits). Thus, as in summary judgment proceedings, a party cannot avoid compelled arbitration by generally denying the facts upon which the right to arbitration rests;

6

instead, the party must identify specific evidence demonstrating a material factual dispute. Id. Stated differently, to defeat the motion, the non-moving party "must show genuine factual issues regarding [its] allegations about the making of the arbitration agreement, such that a jury could find no agreement." Topf v. Warnaco, 942 F. Supp. 762, 767 (D. Conn. 1996).

To resolve the issue of whether the parties are subject to an enforceable arbitration agreement, the court must apply ordinary state-law principles that govern the formation of contracts. Adkins, 303 F.3d at 500-501; see also Hill v. Peoplesoft USA, Inc., 412 F.3d 540, 543 (4th Cir. 2005). In this case, the parties agree that Virginia contract law is controlling.

### I. The March 2007 Letters of Intent

In opposing the motion to compel arbitration, SES first argues that the only enforceable agreement between SES and Cornerstone is reflected in Cornerstone's original and revised letters of intent. By their very terms, however, the letters clearly indicate that the parties intended to contract, not that they had entered into a binding contract. The letters specifically state that "[s]ubject to [Cornerstone's] receipt and execution of a contract with [Howard Shockey], Cornerstone will issue an AIA a401 subcontract [to SES] for the amount below."

In addition to the conditional language contained in the letters of intent, other evidence in the record demonstrates that the parties intended to enter into a formal, written contract, and that their contractual relationship was not based solely on the letters of intent. In June of 2007, after Cornerstone was awarded the detention and security subcontract from Howard Shockey, SES contacted Cornerstone and specifically requested receipt of an "executed contract." SES emphasized that it was "ready to provide installation of this work," and that it was "imminent that [SES] get this information asap." SES subsequently forwarded executed contract documents

7

to SES in August of 2007. The documents included an AIA a401 subcontract, the same type of contract referenced in the letters of intent. Also included was a one-page agreement that set forth a summary of the work to be performed by SES and the total amount to be paid by Cornerstone ($620,000).

Based on the foregoing, it is clear from the record that a formal, written subcontract was contemplated by both Cornerstone and SES, and that such subcontract was conditioned on Cornerstone's receipt of a contract from Howard Shockey. As a result, the letters of intent, at most, constituted an agreement to contract in the future, and federal courts applying Virginia law have held that such "agreements to agree" are not binding contracts. See Beazer Homes Corp. v. VMIF/Anden Southbridge Venture, 235 F. Supp. 2d 485, 490 (E.D. Va. 2002) (holding that a letter of intent was an unenforceable agreement to agree); Showcase Woodworking, Ltd. v. Fluor Daniel, Inc., 1990 U.S. Dist. LEXIS 19614, at *7 (E.D. Va. Apr. 17, 1990) ("By its clear language, the letter states that the parties *intend to contract*, not that they have entered into a binding contract. Once again, an intent to enter into a contract falls short of a binding agreement. It is simply a proposal to contract in the future.") (emphasis in original). Accordingly, the court rejects SES's argument that the only enforceable agreement between SES and Cornerstone is reflected in the letters of intent.

## II. The AIA a401 Subcontract

The court is also unpersuaded by SES's argument that the AIA a401 subcontract is unenforceable because SES never executed the document. Under Virginia law, a written contract signed by only one party may be binding and enforceable even without the other party's

signature, if the other party assented to the agreement. Orbis, Inc. v. ObjectWin Tech., Inc., 2007 U.S. Dist. LEXIS 69597, at *12 (W.D. Va. Sept. 20, 2007) (noting that "the parties may be bound to a writing signed by only one party so long as it is assented to by the other"); Galloway Corp v. S.B. Ballard Constr. Co., 464 S.E.2d 349, 356 (Va. 1995) (holding that the absence of an authorized signature did not defeat the existence of a contract); 17A Am. Jur. 2d Contracts § 34 ("The purpose of a signature on a contract is to show mutual assent; however, the existence of a contract may also be inferred from other external and objective manifestations of mutual assent."). Mutual assent is judged by an objective standard, looking to the express words of the parties and their visible acts, rather than their subjective states of mind. Phillips v. Mazyck, 643 S.E.2d 172, 175 (Va. 2007) Parties are deemed to have manifested assent, and thereby to have rendered a contract enforceable, whenever their conduct reasonably creates an inference by the other party that they have assented. See Lucy v. Zehmer, 84 S.E.2d 516, 522 (Va. 1954) ("An agreement or mutual assent is of course essential to a valid contract but the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts. If his words and acts, judged by a reasonable standard, manifest an intention to agree, it is immaterial what may be the real but unexpressed state of his mind.").

Applying these principles, the court finds from the undisputed evidence in the record that SES engaged in conduct that reasonably created an inference of assent to the terms of the AIA a401 subcontract. Although SES never signed and returned the subcontract as requested by Cornerstone, SES acted as if it considered itself bound by the terms of the contract during the construction phase of the project, and as if it also expected Cornerstone to perform in accordance with the subcontract. As previously stated, SES submitted its applications for payment in

accordance with the terms of the AIA a401 subcontract, and the amounts requested by SES were based on the payment schedule contained in the subcontract. Additionally, SES submitted its change orders pursuant to the AIA a401 subcontract until after the construction phase of the project was completed, and it issued insurance certificates to Cornerstone for the coverage amounts required by the AIA a401 subcontract.

When SES questioned whether a written contract existed in October of 2008, more than a year after receiving the AIA a401 subcontract and performing according to its terms, Cornerstone specifically advised SES that its continued performance constituted acceptance of the contract. SES did not dispute the contract's existence or validity at that time and continued to perform under the contract. It was not until after the construction phase of the project was later completed that SES's president claimed that there was no valid, written contract between SES and Cornerstone and, thus, that SES was not subject to any mandatory arbitration or mediation provisions.

While SES now argues that it never intended to sign or otherwise agree to the terms of the written contract,[4] a court must ascertain whether a party assented to a contract solely from the party's words or acts, not from its unexpressed state of mind. See Phillips, 643 S.E.2d at 175; Lucy, 84 S.E.2d at 522. Here, the court agrees with Cornerstone that SES's conduct during the

---

[4] To support its argument that it never intended to agree to the terms of the written contract, SES emphasizes in its reply brief that the AIA a401 subcontract was attached to a one-page subcontract, which described the work requested by Cornerstone. While SES argues that the one-page subcontract "significantly enlarged" the scope of work described in Cornerstone's previous letters of intent, SES does not explain how any differences in the language of the one-page subcontract materially increased SES's burden in any way. Likewise, while SES emphasizes that Cornerstone made unilateral changes to the AIA a401 subcontract that were "detrimental" to SES, SES does not identify any of those changes. Moreover, it is undisputed that the arbitration provision contained in § 6.2 of the AIA a401 contract was not modified by Cornerstone.

10

course of the construction project reasonably created an inference of assent to the AIA a401 subcontract, and that SES's belated protestations to the contrary are insufficient to defeat the defendants' motion.

In reaching this decision, the court notes that this case is clearly distinguishable from Brooks & Co. Gen. Contractors, Inc. v. Randy Robinson Contracting, Inc., 513 S.E.2d 858 (Va. 1999), the case on which SES primarily relies. While Brooks also involved a dispute regarding the enforceability of a written AIA contract, the facts are considerably different from those in the instant case.

In Brooks, a subcontractor and a general contractor entered into an oral contract regarding work to be performed during the construction of a church. Brooks, 513 S.E.2d at 860. While the general contractor testified that the subcontractor was told that a written contract would be issued, the subcontractor did not recall such statement. Id. at 858. Two weeks later, the general contractor sent the subcontractor an unexecuted AIA form agreement, which contained numerous terms that had not been previously discussed by the parties, including an arbitration clause. Id. The subcontractor received the form agreement but did not sign it or return it to the general contractor. Id. at 859. The subcontractor began work on the project but left the work unfinished. Id. The general contractor completed the unfinished work and demanded arbitration of its claim for damages against the subcontractor. Id. On the subcontractor's motion, the trial court entered an order permanently staying arbitration. Id. The trial court found that there was no meeting of the minds between the parties as to the terms of the AIA agreement. Id.

On appeal to the Supreme Court of Virginia, the general contractor argued that the subcontractor had accepted the terms of the AIA contract by beginning work on the project

11

without indicating any disagreement with the contract's terms. Id. The Supreme Court of Virginia rejected the general contractor's argument, however, and affirmed the trial court's stay of arbitration. In so doing, the Supreme Court emphasized that the general contractor, itself, had not signed the form contract before sending it to the subcontractor, and that the record revealed that "this was the firm's general practice because it expected subcontractors to make changes in the documents." Id. at 860. Additionally, the Court emphasized that there was a preexisting oral contract between the parties, and that there was no evidence that the parties intended for the oral contract to be replaced by a formal, written agreement. Id.

In the instant case, the record presents a very different set of facts. Unlike Brooks, there is no evidence of any preexisting oral contract between Cornerstone and SES. Instead, it was clear from the beginning of the parties' discussions that a written subcontract – specifically, an AIA a401 subcontract – would be issued to SES if Cornerstone entered into a contract with Howard Shockey. After Cornerstone was awarded the detention and security systems contract, it executed an AIA a401 subcontract and forwarded it to SES, thereby agreeing to be bound by the document's terms. Although SES never signed the subcontract, undisputed evidence in the record establishes that the company objectively manifested its assent to the contract through its performance and course of dealing with Cornerstone during the construction phase of the project.

## Conclusion

Accordingly, for the reasons stated, the court finds and concludes that the AIA a401 subcontract and its arbitration provision are enforceable, and that no reasonable jury could find

otherwise.[5] Since it is undisputed that the subject matter of this action falls within the scope of the arbitration provision, the court will grant the defendants' motion to compel arbitration and order the parties to proceed to arbitration in accordance with the parties' agreement. The case will be stayed pending arbitration pursuant to 9 U.S.C. § 3.

The Clerk is directed to send a certified copy of this memorandum opinion and the accompanying order to all counsel of record.

ENTER: This 3rd day of June, 2010.

                                            _____
                                            United States District Judge

---

[5] During the hearing on the defendants' motion, SES requested an evidentiary hearing. However, because SES has failed to raise a genuine issue of material fact regarding the existence of a valid agreement, no evidentiary hearing is required. See, e.g., Scurtu v. Int'l Student Exch., 523 F. Supp. 2d 1313, 1327-1328 (S.D. Ala. 2007); China Resource Prods. v. Fayda Int'l, 747 F. Supp. 1101, 1106 (D. Del. 1990).